## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | **NO. 3:18-cr-00099** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| | ) | |
| **TRAVIS LAMONT SUGGS** | ) | |

## MEMORANDUM AND ORDER

### I. Introduction

Pending before the Court are Defendant's Motion to Suppress (Doc. No. 21), and the Government's Response (Doc. No. 27). The Court held a hearing on the Motion on September 20, 2018.

Through the Motion, Defendant challenges two separate searches: one search, pursuant to a warrant, permitted law enforcement officers to obtain present-time location information from a cell phone thought to belong to Defendant; the other search was of Defendant and his vehicle after what Defendant calls an unlawful arrest. In its Response, the Government represents that it does not intend to introduce "phone pings resulting from the warrant" in its case in chief at trial, and therefore, argues Defendant's challenge to the warrant is moot. At the hearing, the Government also indicated it would not introduce drug evidence in its case in chief that was seized from a house in Kentucky because the location of the house was obtained from the cell phone data. Based on the Government's representations, the Court concludes Defendant's challenge to the search warrant is **DENIED**, as moot.

## II. <u>Evidence Adduced at the Hearing</u>

As to the challenge to the warrantless search, the Government called Alexander Goldberg, an agent with the Tennessee Bureau of Investigation, to testify at the hearing. Agent Goldberg testified that he was involved in an investigation of Defendant approximately two and one-half weeks before Defendant's arrest on March 21, 2018. Officers from the Clarksville Police Department ("CPD") and the Drug Enforcement Administration ("DEA") were also involved in the investigation. According to Agent Goldberg, the investigation began when a confidential informant ("CI") told a CPD officer he had a friend who would introduce CI to the Defendant as a potential source for the purchase of methamphetamine. CI had been arrested during a wiretap investigation and was facing criminal charges.

Agent Goldberg testified that, at the instruction of officers, CI attempted to set up a deal with Defendant on March 14, 2018. The Government played a recording of a phone conversation on that date between CI and Defendant, monitored and recorded by officers, in which the parties discussed, among other things, a deal involving half an "LB," and meeting the next day to complete the transaction. (Government Exhibit 1). The deal ultimately fell through, according to Agent Goldberg, because Defendant wanted to meet in Nashville, rather than Clarksville, and officers concluded they would have less oversight and control of the transaction at a Nashville location.

Agent Goldberg testified CI set up a second meeting, for March 21, 2018, to take place in Clarksville at a McDonald's, where he would purchase a half pound of methamphetamine from Defendant for $3,700. On that date and prior to the scheduled meeting, CI and the officers met at a staging area close to the prearranged location for the meeting. At the staging area, officers

searched CI and CI's vehicle, and discovered a firearm and 9 to 10 grams of methamphetamine in the vehicle. Agent Goldberg testified that, after consultation by DEA Agent Hardin with an Assistant United States Attorney, they decided to go through with the controlled buy, but would arrest CI upon completion of the deal rather than allow CI to walk away. Officers also changed the location of the meeting from McDonald's to a "park-and-ride" lot. After completing a full search of CI and his vehicle, officers provided CI with marked "buy money" as well as a wire for audio recording.

According to Agent Goldberg, approximately eight law enforcement officers were involved in surveillance of the controlled purchase. Two DEA agents conducted visual surveillance of Defendant as he travelled from Kentucky to the agreed location of the deal at the park-and-ride lot in Clarksville. Other officers were situated on site at the agreed location to await Defendant's arrival. Agent Goldberg testified that officers directed CI to the precise location for the deal, and CI was never out of the sight of officers. According to Agent Goldberg, CI was wired for live audio, which was monitored by Agent Goldberg in his vehicle. Before Defendant arrived at the location, Agent Goldberg testified, he heard a phone conversation between CI and Defendant in which CI gave the Defendant directions to the location.

Once Defendant made it to the park-and-ride and pulled into the parking space next to CI's vehicle, CI got into Defendant's car. The Government played an audio clip of the wire recording from March 21, 2018. (Government Exhibit 2). As he monitored the wire on March 21, 2018, Agent Goldberg testified, he heard CI make a reference to "fire smoke," which was a term used by CI (although not provided to him by officers) as a code word to mean drugs were in the car. Agent Goldberg testified he also heard Defendant ask if the CI wanted "one-half pound,"

and heard the CI answer, "yeah." Agent Goldberg said he also heard a bag being shaken and a reference to a lack of "shake," meaning the bag consisted of large shards of methamphetamine, indicating its high quality. Agent Goldberg testified that, at his signal, officers began a "slow roll" to surround Defendant's car and ensure it would not be able to move. Agent Goldberg testified he blocked Defendant's car from behind with his own vehicle, and may have touched the bumper of Defendant's car, but did not "ram" it. Agent Goldberg said he also activated his blue lights.

According to Agent Goldberg, before he could reach Defendant's car to arrest him, the Defendant opened his car door and fled on foot. Agent Goldberg testified he issued verbal commands for Defendant to stop, which Defendant ignored, pursued Defendant for about 15 seconds, and apprehended him. Agent Goldberg said he pulled Defendant's jacket off as he was in pursuit, and another officer took Defendant to the ground. Agent Goldberg testified that an ambulance was called because Defendant's face was bleeding. In pursuing the Defendant, Agent Goldberg testified, officers were concerned that he might have a weapon in light of his history of arrests for weapons possession. According to Agent Goldberg, several items were recovered from Defendant's path of flight, including currency and credit cards.

In a later search of Defendant's vehicle, officers found a large bag of methamphetamine, as well as the "buy money" brought by CI. (Government's Exhibit 3). Agent Goldberg testified other officers arrested CI while he was pursuing the Defendant. Prior to the controlled buy, Agent Goldberg said, CI had signed an "Informant Activation Report" (Defendant's Exhibit 1) outlining his responsibilities but was never "activated" and was not paid.

On cross examination, Agent Goldberg acknowledged that neither Defendant nor CI used

4

the word "methamphetamine." Agent Goldberg explained that methamphetamine was suggested by the use of pounds instead of metric measures, and the use of the term "shake" as a reference to texture and quality, as well as the price at which the substance was offered. Agent Goldberg also acknowledged CI violated his agreement, and had made the statement that he would do anything to stay out of jail. Officers obtained only an audio recording of the transaction, according to Agent Goldberg, because the video technology was not working at the time.

Agent Goldberg testified he had not been involved in another case where an informant brought drugs and a gun to a controlled buy. Even so, Agent Goldberg said, the officers decided not to call off the transaction because they knew Defendant was dealing in methamphetamine and had no other way to apprehend him. According to Agent Goldberg, at the staging area, the CI admitted the weapon belonged to him but denied that the drugs were his. Agent Goldberg testified Robert Delgiorno was riding with him at the time, and they followed CI from the staging area to the deal location. Agent Goldberg testified that Agent Hardin was in another vehicle conducting surveillance and was able to visually confirm the identity of Defendant when he arrived at the park-and-ride.

On redirect, Agent Goldberg testified his decision to arrest Defendant was based on CI's reference to "fire smoke," indicating drugs were present; references to the "shake" meaning the quality of the methamphetamine; and Defendant's question "half-pound, right?" and CI's affirmative response. By the time Agent Goldberg activated his blue lights, Defendant had begun to flee on foot.

Agent Goldberg testified all discussions between CI and Defendant were about methamphetamine, and explained that the term "pounds" and the pricing discussed were

consistent with a transaction involving methamphetamine. In addition, the quantity discussed in the March 14, 2018 conversations – a "half pound" – was the same quantity involved in the controlled buy on March 21, 2018.

Defendant called CPD Agent Robert Delgiorno to testify at the hearing. Agent Delgiorno testified he and Agent Tyvis Woody searched CI's vehicle at the staging area on March 21, 2018. According to Agent Delgiorno, CI told him before the search began that a weapon was in the vehicle between the seats, but CI did not mention the drugs that were found by Agent Woody on the passenger side of the vehicle. Agent Delgiorno testified he searched all compartments of the vehicle thoroughly, and did not find anything else of concern.

Agent Delgiorno initially testified that he and Agent Goldberg traveled from the staging area to the deal location in front of CI's vehicle, but after reading his report of the events, testified he and Agent Goldberg followed CI's vehicle. Agent Delgiorno said he was able to hear the audio of the transaction on the speaker in Agent Goldberg's vehicle, and after the conversation indicated a drug deal was happening, Agent Goldberg notified the other officers to move in. Agent Goldberg moved his vehicle behind Defendant's vehicle and Agent Delgiorno activated the blue lights. Agent Delgiorno testified he took CI to the ground and into custody, and did not see what happened to Defendant. As he was apprehending CI, Agent Delgiorno testified he saw the methamphetamine and buy money from the transaction in the Defendant's vehicle. Agent Delgiorno testified that no officer laid hands on Defendant before he fled on foot. According to Agent Delgiorno, CI is currently serving a state sentence, but has not been charged in federal court.

III. <u>Analysis</u>

Defendant argues his arrest was invalid because officers did not have probable cause to arrest him. As a result, Defendant contends, all evidence obtained after the arrest should be suppressed. To determine whether officers have probable cause for an arrest, a court "'must determine whether at the moment of arrest the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that a suspect had committed or was committing an offense.'" *United States v. Stubblefield*, 682 F.3d 502, 508 (6th Cir. 2012) (quoting *United States v. Smith*, 549 F.3d 355, 359 (6th Cir. 2008)). The court is to view the facts and circumstances of the arrest from the viewpoint of an objectively reasonable police officer. *Id.* To meet the probable cause standard, the officers must have had more than mere suspicion, but they are not required to possess evidence "'sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt.'" *Id.* (quoting *United States v. Romero*, 452 F.3d 610, 616 (6th Cir. 2006)).

The Sixth Circuit has also held that "when a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest." *United States v Woods*, 544 F.2d 242, 260 (6th Cir. 1976); *see also United States v. Duval*, 742 F.3d 246, 253 (6th Cir. 2014). Similarly, "[w]hen a superior officer orders another officer to make an arrest, it is proper to consider the superior's knowledge in determining whether there was probable cause." *Id.*

At the time the officers moved to apprehend Defendant, they had the following

information:  Defendant had agreed to meet – and did meet – CI at a particular location to purchase a half-pound of what officers reasonably assumed to be methamphetamine; over CI's wire, officers heard the CI use a code word indicating drugs were present; both CI and Defendant referred to the "shake" or quality of the substance; and Defendant asked "half-pound, right?" and CI answered, "yes."  The Court concludes that the officers were reasonable in believing, based on this information, that Defendant had committed or was committing an offense. Moreover, by the time the officers apprehended Defendant, they also knew Defendant had attempted to flee, which further supported that conclusion. *See Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (Court holds unprovoked flight in a high-crime area created reasonable suspicion justifying a *Terry* stop, explaining that "[h]eadlong flight" is "the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").[1]

As for Defendant's challenge to the search of his vehicle, the Supreme Court has long recognized an exception to the warrant requirement with regard to the search of vehicles. *United States v. Smith,* 510 F.3d 641, 647 (6th Cir. 2007).  The exception "is justified not only by the exigency created by the 'ready mobility' of vehicles, but also by the lesser expectation of privacy operators have in their vehicles." *Id.*, at 650.  Under the "automobile exception," officers may conduct a warrantless search of a vehicle if they have probable cause to believe the vehicle contains evidence of a crime. *Id.,* at 647. Probable cause exists where "'there is a fair probability

---

[1]   It was not clear at the hearing whether Defendant is pursuing a challenge to the search of his person.  To the extent Defendant raises that challenge, the Court concludes the search of his person was a valid search incident to his lawful arrest. *See, e.g., United States v. Smith*, 549 F.3d at 359 (no additional justification is needed for a search incident to arrest beyond the establishment of probable cause for the arrest).

that contraband or evidence of a crime will be found in a particular place.'" *United States v. Spillman,* 2018 WL 2046137, at *2 (6th Cir. Mar. 19, 2018) (quoting *United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002)).

The same information providing probable cause for the arrest of Defendant also provided probable cause for the search of Defendant's vehicle. Simply put, CI and Defendant had conducted a drug transaction in the vehicle, indicating more than a "fair probability" that evidence of a crime, including the methamphetamine and the buy money, would be found there.

Defendant argues the arrest and search were invalid because CI was completely unreliable, pointing out his possession of a firearm and methamphetamine at the staging area, as well as the absence of any track record supporting his credibility. Although the reliance of officers on hearsay information provided by unreliable informants can detract from probable cause, that was not the case here. *United States v. Franklin*, 622 Fed. Appx 501, 509 (6th Cir. 2015) (in considering search warrant affidavits relying on the hearsay information of a confidential informant or anonymous tipster, the court must consider the veracity, reliability, and the basis of knowledge for that information, as well as whether the informant's hearsay statements have been corroborated by surveillance or other means.) The officers in this case corroborated CI's information by monitoring the phone and text communications between the Defendant and CI leading up to the transaction; searching CI and his vehicle at the staging area and removing the weapon and contraband; maintaining visual surveillance of CI from the staging area until moving in to arrest CI and Defendant; and utilizing a wire to monitor audio of Defendant and CI before and during the transaction. These are all methods of corroborating information provided by a confidential informant which have been approved by courts. *See, e.g.,*

*United States v. Henry*, 299 Fed. Appx 484 (6th Cir. 2008). To the extent CI was unreliable, that unreliability did not undermine the existence of probable cause to arrest Defendant or to search his vehicle.

Thus, the Court concludes that the arrest of Defendant and the search of his vehicle were valid. Accordingly, Defendant's Motion to Suppress (Doc. No. 21) is **DENIED.**

It is so **ORDERED**.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE